UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/18/2020_____

ZAKEENAH SMITH,

                        Plaintiff,

-v-

THE NEW YORK AND PRESBYTERIAN HOSPITAL;
COLUMBIA UNIVERSITY MEDICAL CENTER; NEW
YORK PRESBYTERIAN FOUNDATION, INC.; NEW
YORK PRESBYTERIAN GLOBAL, INC.; NEW YORK
PRESBYTERIAN HEALTHCARE SYSTEM, INC.;
GREGORY SICA, *individually*; and SAMANTHA
SHANKAR, *individually*,

                        Defendants.

18 Civ. 776 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Zakeenah Smith, who identifies as a black and African American woman, is a

lead ultrasound technologist employed by defendant The New York and Presbyterian Hospital

(the "Hospital") who formerly worked with physician defendants Gregory Sica and Samantha

Shankar.  Smith brings discrimination, retaliation, and hostile work environment claims against

the Hospital under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et*

*seq.* ("Title VII"), and identical claims, along with a claim of aiding and abetting discrimination

or retaliation, against all defendants under the New York State Human Rights Law, N.Y. Exec.

Law § 290 *et seq.* ("NYSHRL").  She also brings a breach of contract claim against all

defendants.[1]  Pending now is defendants' motion for summary judgment on Smith's

discrimination, retaliation, creation of a hostile work environment, and aiding and abetting

_____

[1] Smith also brought several claims under the New York City Human Rights Law ("NYCHRL").
She voluntarily dismissed these claims after discovery, because no relevant conduct took place
within New York City.  Dkt. 61 n.2.

discrimination or retaliation claims.  For the reasons that follow, the Court grants summary

judgment for defendants on the Title VII and NYSHRL claims and dismisses, without prejudice,

the breach of contract claim.

I.      **Background**

        A.      **Factual Background**[2]

                1.      **The Parties**[3]

        The Hospital is an non-profit acute care hospital that provides in-patient, ambulatory, and

preventative care across all fields of medicine.  JSF ¶ 4.  The Hospital has a branch at the

Lawrence Hospital Center (the "Lawrence location") in Bronxville, New York.  *See id.* ¶¶ 2, 6.

---

[2] The Court draws its account of the facts of this case from the parties' submissions in support of
and in opposition to defendants' motions for summary judgment, including: the parties' joint
statement of undisputed facts, Dkt. 66-1 ("JSF"); defendants' Local Rule 56.1 statement, Dkt. 70
("Def. 56.1"); the affidavit of Rachel Negron in support of the motion, Dkt. 73 ("Negron Aff.");
the declaration of Brian G. Cesaratto, Esq., in support of the motion, Dkt. 72 ("Cesaratto Decl."),
and attached exhibits; Smith's Local Rule 56.1 counter-statement, Dkt. 75-1 ("Pl. 56.1");
Smith's reply to defendants' 56.1 statement, Dkt. 75-2 ("Pl. Reply 56.1"); the declaration of
Kelly O'Connell, Esq., in opposition to the motion, Dkt. 76 ("O'Connell Decl."), and attached
exhibits; defendants' reply to Smith's 56.1 counter-statement, Dkt. 81 ("Def. Reply 56.1");
defendants' response to Smith's reply 56.1 statement, Dkt. 82 ("Def. Response to Pl. Reply
56.1"); and the reply declaration of Brian G. Cesaratto, Esq., in support of the motion, Dkt. 79
("Ceseratto Reply Decl."), and attached exhibits.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein.
Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary
evidence, and are denied by a conclusory statement by the other party without citation to
conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y.
Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the
statement required to be served by the moving party will be deemed to be admitted for purposes
of the motion unless specifically controverted by a correspondingly numbered paragraph in the
statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the
movant or opponent . . . controverting any statement of material fact[] must be followed by
citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[3] Smith voluntarily dismissed her claims, without prejudice, against New York Presbyterian
Foundation, Inc., New York Presbyterian Global, Inc., and New York Presbyterian Healthcare
System, Inc., which are not her employers.  Dkt. 65.

The Hospital maintains policies that attempt to promote equal opportunities for all employees, regardless of race, color, and gender, and to prohibit retaliation against those who file complaints. *Id.* ¶ 5. In addition, it has policies and rules dedicated to creating a safe and collaborative working environment where employees can provide patients with quality healthcare. *See* Def. 56.1 ¶ 1.

Sica and Shankar (the "Doctors") are radiologists who were employed by Columbia University Medical Center ("Columbia")[4] and granted privileges at the Hospital. *See* JSF ¶¶ 17–19. Both treated patients at the Lawrence location, where they had offices, used hospital equipment, and worked with technologists. *Id.* ¶¶ 21–23. Sica, who identifies as a Caucasian male, worked for Columbia between October 2014 and his voluntary resignation in December 2017. *Id.* ¶ 17; Pl. 56.1 ¶ 25. He supervised other Columbia radiologists who had privileges at the Lawrence location. JSF ¶ 18. Shankar, who identifies as an Indian woman, Pl. 56.1 ¶ 27, also began working for Columbia in October 2014 and remained there until she voluntarily resigned in March 2018, JSF ¶ 19. In 2016, Shankar became a Columbia Associate Medical Director. *Id.* ¶ 20. Both Doctors worked with Smith. *See id.* ¶ 23.

Smith, a New York resident, is a registered diagnostic medical sonographer. Pl. 56.1 ¶¶ 1–2. She began working for the Hospital in 2011 through a staffing agency. *Id.* ¶ 4. At that time, she worked as an ultrasound technologist at the Lawrence location. *See id.* On October 21, 2013, the Lawrence location hired Smith as a full-time employee to fill an opening for a lead ultrasound technologist in its radiology department. *See id.* ¶ 10; JSF ¶ 1. Smith has worked for the Hospital in that same position since 2013. *See* JSF ¶¶ 2, 7.

---

[4] Columbia is not a proper party because it was never served. In addition, Smith has never been employed by Columbia. JSF ¶ 3. However, physicians who are Columbia employees can apply for privileges to treat patients at the Hospital. *Id.* ¶ 16.

## 2. Smith's Employment with the Hospital

As the lead ultrasound technologist in the radiology department, Smith's job responsibilities consist of performing ultrasounds of various parts of the body, including a patient's breasts, head, neck, torso, legs, or arms; creating protocols and other procedures for other ultrasound technologists to follow; managing the work schedules of technologists who report to her; and ensuring an orderly workflow for the ultrasound department. *Id.* ¶ 8; Def. 56.1 ¶ 5. The job description of a lead ultrasound technologist also requires Smith to "[p]erform[] duties of Ultrasound Technologist as needed." Def. 56.1 ¶ 5 (alterations in original). The technologists Smith supervises are diverse and include Veveeine Carroll, a black woman, and Barbara Brown, a non-white woman. *Id.* ¶ 41.

The radiology department consists of several modalities, one of which is ultrasound. *See id.* ¶ 42. The lead technologists in the other modalities have diverse backgrounds. *See id.* ¶ 43. These other lead technologists include Melissa Aquino, a non-white female in Mammography; Evan, a non-white male in X-Ray; Fabian Falcon, a white male in CT; Benny Madappatt, a non-white male in MRI; Margaret Minieri, a non-white female in Interventional Radiology; and Timothy Walsh, a white male. *Id.*

During her employment, Smith has reported to two black, African American supervisors: Andrew Worrell, the former Chief Radiology Technologist, and Raymond Farquharson, the former Administrative Director of Radiology. JSF ¶¶ 9–11. First, she reported to Worrell, who then reported to Farquharson, until Worrell left the Hospital in 2014. *Id.* ¶¶ 9, 11. Next, she reported directly to Farquharson until his departure in 2017. *Id.* ¶ 11. Smith has also interacted with other Hospital employees, including Assunta Bruno, former Director of Human Resources; Tim Hughes, Vice President; Tracy Lewis, Vice President; Vera McEnroe, Interim Director of

Radiology; and Rachel Negron, Vice President of Human Resources. *Id.* ¶¶ 24, 26; Def. 56.1 ¶ 26.

Throughout her time at the Hospital, Smith has not applied for any promotions or transfers, and has received regular pay raises. JSF ¶¶ 12, 14. She has also received satisfactory performance reviews, although Farquharson did note that Smith could improve in her interpersonal skills, communication skills, and inclusion of those outside her ultrasound team. *Id.* ¶ 14; Def. 56.1 ¶ 20. She has never been suspended, demoted, or placed on a performance improvement plan ("PIP").[5] Def. 56.1 ¶ 17.

### 3. Overview of Complaints to Human Resources

At times, Smith has brought concerns to Human Resources. JSF ¶ 38. She has raised claims, *inter alia*, of racial discrimination, retaliation, hostile work environment, and harassment. *See, e.g.*, Pl. 56.1 ¶¶ 20–21 (June 12, 2014 EEOC charged based on race discrimination), ¶ 72 (December 27, 2016 complaint against Sica), ¶ 92 (April 6, 2017 formal grievance); Def. 56.1 ¶ 32 (April 6, 2017 email complaint); JSF ¶ 26 (April 18, 2017 harassment complaint). She also

---

[5] Smith unsuccessfully attempts to dispute these facts. Defendants cite the Negron Affidavit for their proposition, *see* Negron Aff. ¶ 23, but Smith objects that the facts in that affidavit were not produced in discovery and Negron was not deposed, Pl. Reply 56.1 ¶ 17. Defendants, persuasively, respond that Negron was identified as a witness at several points during discovery, and Smith chose not to depose her. Def. Response to Pl. Reply 56.1 ¶¶ 2, 17. In addition, such facts are admissible as they are based on Negron's personal knowledge. *Id.* ¶ 2. Smith, who had meetings with Negron about the incidents at issue in this suit, cannot use her decision not to depose Negron as a shield from the affidavit, especially while failing to cite any conflicting admissible evidence of her own. The Court thus disregards Smith's multiple identical objections to defendants' use of the Negron Affidavit.

In a similar vein, Smith asserts that Hughes suggested that she be put on a PIP and that Sica monitor her. Pl. 56.1 ¶ 98. Defendants dispute this fact, arguing that neither piece of evidence Smith cites—the transcript of a May 5, 2017 meeting, O'Connell Decl., Ex. 30, or an email chain from that same day, *id.*, Ex. 31—support her proposition. Defendants are correct: Neither source even mentions a PIP or the possibility of Sica monitoring Smith. Thus, the Court takes these facts—that Smith has never been suspended, demoted, or placed on a PIP—as admitted.

complained about a temporary reassignment to another unit, *see* Pl. 56.1 ¶ 60, and a verbal

warning she had recieved, *id.* ¶ 101.

The Hospital investigated the complaints that Smith made and found no evidence of

harassment or retaliation. JSF ¶ 41. Smith's supervisors never made any disparaging comments

based on her race, color, or sex. *Id.* ¶ 49. Similarly, she has never heard the Doctors make racist

or sexist comments. *Id.* ¶ 51. Accordingly, she has never told Human Resources that anyone has

made disparaging remarks of that nature against or toward her. *Id.* ¶ 50.

Other technologists and employees have complained to Human Resources about their

interactions with Smith. *Id.* ¶ 39. Sica and Shankar had also received complaints about Smith.

*Id.* ¶ 25. These complaints included, *inter alia*, the following:

- Complaints from ultrasound technologists and other employees about Smith's
  tone and responses when communicating with them, Def. 56.1 ¶ 22;

- Complaints that her communications were causing distrust and inefficiency within
  the radiology department, *id.* ¶ 35;

- Complaints that her interpersonal conflicts with technologist and radiologists
  were negatively affecting patient care, *see* JSF ¶ 32 (complaints from Aquino,
  Brown, and Carroll); Def. 56.1 ¶ 21 (complaint from Sica);

- Complaints from technologists and other employees that she bullied, harassed,
  and disrespected them, *see* Def. 56.1 ¶ 29 (March 8, 2017 complaint from
  Brown), ¶ 34 (May 4, 2017 complaint from Carroll regarding two separate
  incidents), ¶ 37 (May 31, 2017 complaint from Mirna Rodrigues, a front desk
  receptionist in the radiology department);

- Complaints from technologists that Smith was unprofessional, defensive, and aggressive, *see id.* ¶ 25 (December 8, 2016 complaint from Brown), ¶ 30 (March 23, 2017 complaint from Carroll);

- Complaints that she unreasonably expected to be consulted on all cases and assignments, *id.* ¶ 35;

- Complaints that she failed to perform her work as expected, *see id.* ¶ 25 (December 8, 2016 complaint from Brown regarding work in breast imaging); and

- Complaints from technologists that she gave preferential treatment to certain technologists when setting work schedules and that she refused to accommodate requests for schedule changes, *see id.* ¶ 26 (December 13, 2016 complaint from Carroll), ¶ 29 (March 8, 2017 complaint from Brown).

On multiple occasions, Smith met with Human Resources personnel, including former Director Bruno, to discuss the complaints. JSF ¶ 40.

### 4.    Smith's 2014 EEOC Charge

On June 12, 2014, Smith filed her first EEOC charge against the Hospital, specifically alleging that a radiologist, Dr. Koch, who had treated patients at the Lawrence location, had violated Title VII based on racial discrimination. *See* Pl. 56.1 ¶¶ 20, 21; *see also* Def. 56.1 ¶ 3. On January 18, 2015, that charge was settled. Def. 56.1 ¶ 4. The Hospital, while admitting no Title VII violation, agreed to review its anti-discrimination policies and to provide anti-discrimination training to the radiology department. *See id.*

Relevant here, the Hospital was aware of the 2014 EEOC charge. Pl. 56.1 ¶ 23. Sica was also aware of the charge, as Smith informed him that she had filed such a charge soon after he began working at the Lawrence location. Def. Reply 56.1 ¶ 23.

### 5. Smith's November 2016 Temporary Reassignment to Breast Imaging

On December 22, 2014, Farquharson told Smith that there was "an obvious tension between ultrasound and breast imaging," most notably between Aquino and Carroll, on one side, and Smith on the other. Def. 56.1 ¶ 23. He told Smith that the conflict between the groups needed to stop. *Id.* Sica had received complaints about Smith from ultrasound technologists before November 2016 and had reported them to Farquharson. *Id.* ¶ 24.

In or around November 2016, Farquharson temporarily reassigned Smith to rotate through the breast imaging center, located a floor below the main ultrasound floor, to perform breast ultrasounds a few times per week. JSF ¶ 29;[6] Pl. 56.1 ¶ 57; Def. 56.1 ¶ 6. There were several reasons for this reassignment. First, Melissa Urena, one of the breast imaging technologists, was taking maternity leave, which would leave the breast imaging center short staffed.[7] *See* JSF ¶ 30. Urena and Brown were the usual technologists who performed breast imaging at the time. Pl. 56.1 ¶ 51. Second, Smith was a qualified breast imager. JSF ¶ 31. She even stated that she was "the best" at breast imaging among the technologists. Def. 56.1 ¶ 8. Third, Farquharson saw Smith's temporary work in the breast imaging center as an opportunity

---

[6] Smith agrees, in the JSF, that she was "temporarily assigned" to rotate to breast imaging. JSF ¶ 29. At various points in her 56.1 counter-statement, she states that she was "transferred" there. *See, e.g.*, Pl. 56.1 ¶ 53. The JSF is a joint statement that "set[s] out all facts on which the parties agree." Individual Rules 3.H.i. Smith is now bound by her agreement that the facts in the JSF are true. In addition, the evidence supports that Smith was temporarily reassigned to breast imaging, as opposed to transferred. *See, e.g.*, O'Connell Decl., Ex. 1 ("Smith Depo Tr.") at 224–25 (Smith explaining that she stopped reporting to breast imaging likely sometime in 2017). The Court thus treats her reassignment as temporary.

[7] Smith states that the Hospital asked her to report to breast imaging several months before Urena's maternity leave. Pl. 56.1 ¶ 52. Defendants dispute this as inconsistent with the JSF, which states that Farquharson temporarily reassigned Smith in November or December 2016, because of Urena's maternity leave. *See* Def. Reply ¶ 52 (citing JSF ¶¶ 29, 30). Drawing the inference in Smith's favor, the Court will assume that the Hospital made this request a few months earlier.

to deflate interpersonal conflicts that Smith was having with some other technologists, including Aquino, the lead mammography technologist, and Brown and Carroll, both of whom reported to Smith. *See* JSF ¶ 32; Def. 56.1 ¶ 41. These conflicts had already led to complaints filed against Smith. JSF ¶ 32. On November 27, 2016, Farquharson sent an email to Bruno and Lewis of Human Resources, stating, "Dr. Sica and I agreed to rotate Zakeenah Smith our lead [ultrasound] tech through breast imaging. This was because of some recent events that were less than professional on her part, and we thought both areas (1st and 2nd floor) would benefit from her rotating to [mammography] a few days a week." Def. 56.1 ¶ 6. Farquharson hoped that the rotation would encourage Smith to "step up as a leader" and to collaborate with Aquino and the other technologists. JSF ¶ 33.

When Smith rotated to breast imaging, none of her duties as lead ultrasound technologist were taken away,[8] and her pay remained constant. *Id.* ¶ 34; Def. 56.1 ¶ 11. No other technologists were asked to rotate through breast imaging. Pl. 56.1 ¶ 54. The parties dispute whether Smith was the only technologist available when Urena took maternity leave. *See* Pl. Reply 56.1 ¶ 9; Def. Reply 56.1 ¶ 59. Smith complained to Bruno in Human Resources about the reassignment. Pl. 56.1 ¶ 60.

---

[8] Despite her agreement, in the JSF, that none of her duties were taken away, *see* JSF ¶ 34, Smith quibbles with this in her 56.1 counter-statement. She states that the reassignment made it more difficult to fulfill her lead technologist duties because of "the loss of some duties, such as being responsible for the department at all hours," and that she "no longer had any supervisory responsibilities" and was "performing as a staff technologist" while in breast imaging. Pl. 56.1 ¶ 63 (quoting Smith Depo Tr. at 258), ¶ 65 (quoting Smith Depo Tr. at 223–24). Drawing all inferences in Smith's favor, the Court credits that the reassignment made it more difficult for her to complete her lead technologist duties and that she was not acting in her supervisory capacity while on the breast imaging floor. But the Court does not view these points as raising a disputed fact as to whether the Hospital took any lead technologist duties or responsibilities away from Smith while she helped in breast imaging a few days a week. Instead, the Court, deferring to the JSF, which binds Smith, will treat the lack of loss of duties as undisputed.

On December 8, 2016, Brown, who worked in breast imaging, *see* Pl. 56.1 ¶ 51, complained to Bruno that Smith was acting unprofessionally in the breast imaging center. Def. 56.1 ¶ 25. Specifically, Brown complained that Smith was defensive when a radiologist attempted to explain to her the workflow in breast imaging, and that Smith did not report to the breast imaging center when she was supposed to or perform scans there as she should have. *Id.*

### 6. December 2016 Emails and January 2017 Meeting

On December 6, 2016, Smith emailed Bruno, requesting "to schedule a time to speak with you in which I can file a grievance please." Pl. 56.1 ¶ 39.

On December 27, 2016, Smith complained to Bruno and Lewis in Human Resources, via email, that Sica had been harassing her:

> I would like to once again reaffirm my stance that I am being targeted for harassment[,] including but not limited to increased scrutiny, being transferred to a less desirable position, and creating a hostile work environment. Unfortunately I am not the only one who is being affected[.] On December 23rd[,] Melissa Urena called me audibly shaken and distressed due to an interrogation by Dr. Sica. Following [that,] Melissa Urena delivered one month before her due date. This friction has caused a rift between the technologist and is affecting patient care. Also these tactics of illegal harassment were the same ones employed against Dr. Sophie Chheang [sic].

*Id.* ¶ 72; Cesaratto Decl., Ex. 21 at 2.

On January 11, 2017, after Smith's email, Smith attended a meeting with Sica, Shanker, Human Resources Director Bruno, Vice President Lewis, and interim Director of Radiology McEnroe. JSF ¶ 24. Smith secretly recorded this meeting. *Id.*; *see* Cesaratto Decl., Ex. 22 ("Jan. 11, 2017 Tr."). The purpose of the meeting was to address concerns within the radiology department and to develop a plan to move forward. Pl. Reply 56.1 ¶ 28. The meeting also addressed complaints that other employees had reported about Smith, including her use of rude and profane language and her inability to accept feedback. *Id.*

By the time of this meeting, Sica had learned that Smith had drafted an EEOC charge that may have been related to him. Def. 56.1 ¶ 60. At some point, Carroll had shown him a photograph she had taken of Smith's EEOC documents. *See* Def. Reply ¶ 41. During this meeting, Sica told Smith, "I was shown a picture of a discrimination complaint that you were writing about me after you came to talk to me about the case. So I have seen that." *Id.* ¶ 75; Jan. 11, 2017 Tr. at 7.[9] Sica also stated, "there's been a, sort of, I guess, slow demise between the [radiologists] and you in terms of work . . . so, there's now a general feeling that it's difficult to work with you." Def. Reply 56.1 ¶ 76; Jan. 11, 2017 Tr. at 4–5. He went on, "that's based on, you know, there wasn't one incidence [sic], it's many incidents. I think you have sent me some inflammatory emails that were inappropriate." Def. Reply 56.1 ¶ 76; Jan. 11, 2017 Tr. at 5. Smith later responded to Sica, "I was told I was being targeted. I was told that you had a personal interest in having me fired." Def. Reply 56.1 ¶ 78; Jan. 11, 2017 Tr. at 10.

In addressing complaints made against her by her subordinates, Smith stated,

> The same people consistently complain . . . [The technologists are] absolutely going to complain about me . . . Because I don't give them what they want. So, when you are habitually late, when you get a "need improvement" for punctuality on your . . . evaluation, when you come in two hours late and then you complain on that day because there's a miscommunication, absolutely. You're going to have a complaint about me because you're trying to cover up for the fact that you're not doing what you're supposed to be doing.

---

[9] Smith highlights these comments from Sica in her 56.1 statement. *See* Pl. 56.1 ¶¶ 75–76, 78. She purports to be directly quoting from the meeting transcript, but her words differ slightly from that transcript. Defendants admit the statements as evidenced in the transcript, *see* Def. Reply 56.1 ¶¶ 75–76, 78, and the Court consequently takes those statements as true.

Def. Reply 56.1 ¶ 81; Jan. 11, 2017 Tr. at 9, 11.  Smith also said, "I'm asking for there to actually be an investigation."[10]  Pl. 56.1 ¶ 82; Jan. 11, 2017 Tr. at 8.

### 7.    Smith's March 2017 Confrontation and Later Verbal Warning

On March 23, 2017, Carroll told Smith that Carroll would perform a vascular ultrasound, because that was her specialty.  Def. 56.1 ¶¶ 12–13.  This led to an inappropriate exchange between Carroll and Smith in front of a patient.  JSF ¶ 35.  The exchange violated the Hospital's policies governing professionalism and courtesy toward patients and coworkers.[11]  *See* Def. 56.1 ¶ 13.  Carroll and Smith both emailed Human Resources about the incident.  *See* Pl. 56.1 ¶ 83; Def. Reply ¶ 83; Def. 56.1 ¶ 30.  On May 18, 2017, as a result of the incident, they both received the same verbal warning.  JSF ¶ 35; *see also* Cesaratto Decl., Exs. 31–32 (documentation of the verbal warnings).  The Hospital uses verbal warnings as a tool to remind employees of its expectations for their behavior and performance.  JSF ¶ 36.  Smith's verbal warning did not lead to further discipline, demotion, or a reduction in her performance rating.[12]  Def. 56.1 ¶ 16.

---

[10] The parties dispute the meaning of this quote.  Smith alleges that she was concerned that the Hospital was investigating only complaints against her and not her own complaints about discrimination, so she asked for an investigation.  Pl. 56.1 ¶ 82.  Defendants state that Smith's request for an investigation came, instead, during a discussion of complaints made against Smith.  Def. Reply 56.1 ¶ 82.  Although the transcript supports an inference in favor of defendants' perspective, the Court will draw the reasonable inference in Smith's favor—that she was asking for an investigation of her complaints.

[11] Smith objects, claiming that the Negron Affidavit does not support defendants' claim.  Pl. Reply ¶ 13.  Her assertion is plainly incorrect.  The Affidavit states, "Plaintiff and Carroll's conduct violates the Hospital's Rules of Conduct.  Specifically, by arguing in front of the patient, both Plaintiff and Carroll engaged in disruptive, discourteous, and unprofessional conduct.  Additionally, by arguing in front of the patient, both Plaintiff and Carroll established an inappropriate and/or unwelcome personal relationship with a patient of the Hospital."  Negron Aff. ¶ 15.

[12] Smith again objects that the cited material does not support the claim.  Pl. Reply 56.1 ¶ 16.  It clearly does:  "Plaintiff's verbal warning did not lead to any further discipline, demotion, termination, or a lower performance review rating."  Negron Aff. ¶ 17.

In May 2017, Smith initiated a grievance proceeding with the Hospital to have her verbal warning removed from her employment record. *Id.* ¶ 15; *see also* Pl. 56.1 ¶ 101. The Hospital conducted the grievance process, which included meeting with Smith, and determined that the warning had been proper. Def. 56.1 ¶ 15.

Carroll did not file any EEOC charges against the Hospital. JSF ¶ 37.

### 8. Carroll's April 2017 Development of Vascular Protocols

In April 2017, Carroll was working to draft vascular protocols. *See id.* ¶ 42. Carroll was the only technologist with a vascular certification and wanted to work on developing such protocols. *Id.* ¶ 43. Smith, unlike Carroll, does not have a vascular certification, but Smith complained that Carroll had been assigned to work on the protocols. *Id.* ¶¶ 42, 46. Farquharson and Sica informed Smith that Carroll was working with the radiologists on the protocols because she had a vascular certification. *Id.* ¶ 44. Smith agreed that Carroll's having the only vascular certification was a legitimate business reason for her to work on the protocols, and Smith did not allege that Carroll was treated better than her because of race or gender (both are black women). *See id.* ¶¶ 37, 45, 48. To that end, Smith, in an April 5, 2017 email sent to physicians and Human Resource personnel, stated: "[T]o my knowledge all technologists in the department of ultrasound are aware that Ms. Carroll is developing the ultrasound vascular protocols, which we all support." *Id.* ¶ 47 (alteration in original).

### 9. April 2017 Emails and May 2017 Meeting

Also in her April 5, 2017 email, Smith complained about Sica criticizing another technologist regarding an ultrasound and about instructions that he had given Smith about handling a difficult patient and keeping him informed. Def. 56.1 ¶ 31. The next day, on April 6, 2017, Sica responded to Smith—copying physicians, Human Resource personnel, and administrators—and stated:

This is affecting department morale and patient care, and is creating a level of distrust and unprofessionalism.

Everyone is aware that these have been chronic problems, at least since Columbia assumed professional duties in October 2014. I have personally experienced inappropriate and unprofessional emails, and at the January meeting Zakeenah admitted that she was on the "offensive" as she heard from a radiologist (one who may have already been dismissed) that I was trying to fire her. This was a surprise and unsettling to me.

Its [sic] obvious to all that the current structure and supervision of the ultrasound section is not working. I am asking that the administration intervene so we can move forward with creating a more unified and professional department and focus our time and energy on providing the best patient care possible.

*See* Pl. 56.1 ¶¶ 87–88; Def. Reply 56.1 ¶¶ 87–88; Cesaratto Decl., Ex. 25 ("Apr. 2017 Emails")

at 2–3. Smith responded to the email chain by complaining that she had been placed under

increased scrutiny, subjected to a hostile work environment, assigned less desirable duties, had

her duties assigned to other technologists, subjected to false rumors spread about her, and

colluded against by others trying to have her employment terminated. Def. 56.1 ¶ 32; *see*

Apr. 2017 Emails at 2.

Separately, also on April 6, 2017, Smith emailed Human Resources Director Bruno and

Vice President Hughes with the subject line, "Formal Grievance." Pl. 56.1 ¶ 92. She wrote:

I am writing to raise a formal grievance for inequity in treatment and the creation of a hostile work environment.

The reason [I] believe that I have a personal grievance is during a meeting dated January 11th[,] 2016 Dr. Sica was quoted as saying after becoming aware of a discrimination complaint I was to be put under increased scrutiny. Dr. Sica also stated he had no problem with my work performance and his gripes against me were interpersonal. Since this meeting both Dr. Shankar and Dr. Sica have ignored my various attempts to create as asked the ultrasound protocols. Dr. Sica has worked exclusively with Ms[.] Carroll in creating the vascular ultrasound protocols though Ms[.] Carroll has more patient recalls than any other technologist in the department of ultrasound and neither has the scanning ability or the clinic acumen to properly perform the function.

As the lead technologist in the department of ultrasound I emailed Dr. Viragh in regards to a concern[.] Dr. Sica then CC'd another member of the ultrasound staff

perpetuating the hostile work environment and making my work more difficult. This behavior is retaliatory against protected activity as defined by the [EEOC]. If this does not satisfy the requirements to initiate the first step of a grievance[,] please advise me as to how I might do so.

*Id.*; Def. Reply 56.1 ¶ 92; O'Connell Decl., Ex. 41.[13]

Later, on April 17, 2017, Sica sent an email about issues in the ultrasound department. *See* JSF ¶ 26; O'Connell Decl., Ex. 28. On April 18, 2017, Smith responded to this email by removing Sica from the recipient list and sending the email to Bruno, Hughes, and McEnroe. JSF ¶ 26. She stated, "[b]ecause this email is proof of continued harassment I will not respond directly to Dr. Sica. I ask for administrations [sic] continued help in this matter as this harassment is in violation of federal law." *Id.*; O'Connell Decl., Ex. 28.

On May 5, 2017, Smith met with Sica, Hughes, McEnroe, and Human Resources Vice President Negron. Def. 56.1 ¶ 35. Again, Smith secretly recorded the meeting. *See id.* ¶ 40; *see* Cesaratto Decl., Ex. 28 ("May 5, 2017 Tr."). The meeting addressed communication issues between Smith and the radiology department that were causing distrust and inefficiency within the team. Def. 56.1 ¶ 35. It also addressed her unreasonable expectation to be consulted on all cases or assignments. *Id.* Sica and the Hospital employees counseled Smith to improve her communications and to be more careful with the words she used. *Id.* ¶ 40. She was also advised that all Columbia physicians and Hospital employees were free to bring any complaints to the Hospital. *Id.* In the meeting, Sica stated:

And I've asked you and Tim, and Vera and our new administrator, that going forward, I don't want to ever hear again that, well, there's no documentation or things aren't investigated. So when an inappropriate or a complaint email gets sent out, we need to address it, and there needs to be a write-up about it, and it goes in some files. So we will have documentation of all these so that we're not trying to

---

[13] Smith did not file Exhibit 41 electronically, but it was included in the hard copy materials provided to the Court.

recall what happened.  I mean, that I expect this from the hospital, and Columbia Radiology insists that we're—that the radiologists are protected from this.

Def. Reply 56.1 ¶ 97; May 7, 2017 Tr. at 15.

Following the meeting, on May 26, 2017, Sica emailed Hughes, McEnroe, and Negron to inform them that Smith was unable to act professionally and to communicate with the radiologists and other Hospital personnel, which was hurting patient care.  Def. 56.1 ¶ 36.

On May 29, 2017, Smith began an approved medical absence from her work at the Hospital.  JSF ¶ 27.  On September 6, 2017, she returned to work.  *Id.* ¶ 28.

### B.     Procedural History

On January 29, 2018, Smith filed her complaint.  Dkt. 1 ("Compl.").  On April 20, 2018, the Hospital, along with defendants New York Presbyterian Foundation, Inc., New York Presbyterian Global, Inc., and New York Presbyterian Healthcare System, Inc. (together with the Hospital, the "Hospital Defendants"), requested an extension of time to answer the Complaint. Dkt. 18.  On April 24, 2018, the Court approved that request.  Dkt. 19.  On April 25, 2018, Sica and Shankar also requested an extension to respond to the Complaint, Dkt. 20, which the Court granted, Dkt. 21.  On April 29, 2018, the 90-day deadline for service passed without Smith having served Columbia.  On June 4, 2018, the Court approved a second request from the Hospital Defendants extending their time to answer.  Dkts. 28–29.  On June 15, 2018, the Hospital Defendants filed their answer, Dkt. 29, as did the Doctors, Dkt. 30.

On June 18, 2018, the Court scheduled an initial pretrial conference for July 17, 2018. Dkt. 31.  That same day, the case was automatically referred to the District's employment discrimination mediation program.  Dkt. 32.  On July 13, 2018, the parties filed a proposed case management plan, Dkt. 36, and, on July 16, 2018, a joint letter describing the case, Dkt. 38, in

advance of the conference.  On July 17, 2018, the Court held the initial conference and approved the case management plan.  Dkt. 39.

On September 17, 2018, the parties participated in a mediation session, which was unsuccessful.  Dkt. 43.  On October 25, 2018, the Hospital Defendants raised a discovery dispute.  Dkts. 44–45.  That same day, Smith requested an extension of time to complete discovery, Dkt. 46, which the Court approved, Dkt. 47.  On January 9, 2019, the parties requested a one-week adjournment of the case management conference.  Dkt. 49.  The next day, the Court granted that request.  Dkt. 50.  On January 28, 2019, the Doctors requested an extension of the discovery deadline, Dkts. 51–52, which the Court approved, Dkts. 53–54.  On February 26, 2019, fact and deposition discovery ended.  Dkt. 54.

On March 12, 2019, the Hospital Defendants filed a pre-motion letter, previewing their anticipated summary judgment motion.  Dkt. 57.  The following day, the Doctors did the same. Dkt. 58.  On March 14, 2019, the Court ordered that the upcoming case management conference serve as a pre-motion conference.  Dkt. 59.  On April 10, 2019, after Smith failed to submit a letter in response to defendants' pre-motion letters, the Court ordered Smith to file a letter outlining her arguments opposing summary judgment, if any.  Dkt. 60.  On April 11, 2019, Smith filed such a letter.  Dkt. 61.  In that letter, she also voluntarily dismissed her claims under the NYCHRL.  *Id.* at 1 n.2.  The same day, the Court held the pre-motion conference and set a briefing schedule for defendants' summary judgment motion.  Dkt. 62.  On April 12, 2019, Smith filed a notice of voluntary dismissal of her claims against New York Presbyterian Foundation, Inc., New York Presbyterian Global, Inc., and New York Presbyterian Healthcare System, Inc.  Dkt. 63.  On April 15, 2019, the Court approved that dismissal, leaving the Hospital as the only remaining Hospital Defendant.  Dkt. 65.

On May 3, 2019, the parties filed their joint statement of undisputed facts. Dkt. 66-1. On May 24, 2019, the Doctors filed their motion for summary judgment, Dkt. 67, accompanied by a memorandum of law in support, Dkt. 68 ("Doc. Mem."). The Hospital also filed its motion, Dkt. 69; a memorandum of law in support, Dkt. 71 ("Hosp. Mem."); the Cesaratto Declaration and its attached exhibits, Dkt. 72; the Negron Affidavit, Dkt. 73; and an affirmation of Natalia M. DiPalma, Dkt. 74. Defendants also filed a joint 56.1 statement. Dkt. 70. On June 14 and 17, 2019, Smith filed her memorandum of law in opposition to defendants' motion, Dkt. 75 ("Smith Mem."); her 56.1 counter-statement, Dkt. 75-1; her reply to defendants' 56.1 statement, Dkt. 75-2; and the O'Connell Declaration, along with the exhibits attached thereto, Dkt. 76. On June 24, 2019, the Doctors filed their reply. Dkt. 77 ("Doc. Reply"). The Hospital also filed its reply memorandum, Dkt. 80 ("Hosp. Reply"), accompanied by the Cesaratto Reply Declaration and its attached exhibits, Dkt. 79. The three defendants also filed a reply to Smith's 56.1 counter-statement, Dkt. 81, and a response to Smith's reply to their 56.1 statement, Dkt. 82.

## II.     Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to

18

overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

### III. Discussion

Smith brings claims of discrimination, retaliation, and hostile work environment under Title VII and the NYSHRL. These relevant standards overlap substantially. Smith also brings a claim of aiding and abetting discrimination, retaliation, and other unlawful conduct under the NYSHRL, and a claim of breach of contract under state law.

The Court first addresses Smith's claims of race and gender discrimination under federal and state law, followed by her claims of retaliation under federal and state law, and then her claims of hostile work environment under federal and state law. Finally, the Court addresses Smith's remaining state-law claims.[14]

### A. Discrimination Under Title VII and the NYSHRL

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). Similarly, the NYSHRL states that it is "an unlawful discriminatory practice" for an employer, based on an individual's race, color, or sex, "to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. State Exec. Law § 296(1)(a).[15]

Both Title VII and NYSHRL discrimination claims are governed by the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

---

[14] Because the Court ultimately grants summary judgment in favor of all defendants, it does not have occasion to separately examine the Doctors' argument that they were not Smith's employers. Doc. Mem. at 5–6.

[15] In her brief, Smith states that she also brings anti-discrimination claims under 42 U.S.C. § 1981. *See, e.g.*, Smith Mem. at 1. Section 1981 allows for individual liability under federal law, whereas Title VII does not. *Tolbert v. Smith*, 790 F.3d 427, 434 n.3 (2d Cir. 2015). Smith, however, did not assert any claim under § 1981 in her Complaint. The Court thus only addresses her anti-discrimination claims under Title VII against the Hospital and the NYSHRL against all defendants.

*Tolbert*, 790 F.3d at 434; *see also Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) (describing these claims as "analytically identical").  Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Holcomb*, 521 F.3d at 138.  To do so, the plaintiff "must show: (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138).  In employment discrimination cases, the burden of establishing a *prima facia* case is "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).  However, a plaintiff cannot establish a *prima facie* case based on "purely conclusory allegations of discrimination, absent any concrete particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985).

If the plaintiff can demonstrate a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)).  At that point, the burden of production shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment."  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (clarifying that employer's burden is "one of production, not persuasion").

If the employer satisfies that burden, the presumption of discriminatory intent drops away, and "the plaintiff must establish, by a preponderance of the evidence, that the employer's

justification is a pretext for discrimination." *Lenzi*, 944 F.3d at 107 (citation omitted); *see also*

*Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996). The plaintiff, however, is "not

required to show that the employer's proffered reasons were false or played no role in the

employment decision, but only that they were not the only reasons and that a prohibited factor

was at least one of the 'motivating' factors" for the decision. *Holcomb*, 521 F.3d at 138 (citation

omitted); *see also* 42 U.S.C. § 2000e-2(m) (race, color, or sex must be "a motivating factor" for

employment decision).

### 1. *Prima Facie* Case

Defendants do not appear to contest that Smith has satisfied the first two elements of her

*prima facie* case. The Court assumes that (1) as a black and African American woman, Pl. 56.1

¶¶ 1, 14, Smith is a member of a protected class, and (2) as a registered diagnostic medical

sonographer who has received regular satisfactory performance reviews and pay raises, *id.* ¶ 2;

JSF ¶ 14, she was qualified for her job. Defendants instead argue that Smith has not

demonstrated the last two elements, because she has failed to show that (3) she suffered an

adverse employment action, or (4) the circumstances gave rise to an inference of discrimination.

*See* Hosp. Mem. at 13–16; Doc. Mem. at 7–9. The Court agrees.

An adverse employment action is a "'materially adverse change' in the terms and

conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755

(2d Cir. 2004) (citation omitted). "To be materially adverse, a change in working conditions

must be more disruptive than a mere inconvenience or an alteration of job responsibilities."

*Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders*, 361 F.3d at 755).

"Examples of such a change include termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices unique to a particular situation." *Id.* (quoting *Sanders*, 361 F.3d at 755).

The adverse action must also be made in circumstances giving rise to an inference of discrimination. The facts required to meet this element of the *prima facie* case will "inevitably vary in different employment discrimination cases." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001); *see Little v. Nat'l Broad Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002). The circumstances giving rise to an inference of discrimination may include "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action]." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

Smith raises several potential adverse actions. *See* Smith Mem. at 15–17 (in context of retaliation claim). These include her temporary reassignment to breast imaging in November 2016, the verbal warning that she received as a result of the March 23, 2017 incident, and Carroll's assignment to draft vascular protocols. They also include Smith's claims that she was subjected to excessive scrutiny, notably in the form of the Hospital's allowing Sica to monitor her and placing her on a PIP. None of these presents an actionable adverse action, let alone an adverse action taken in circumstances giving rise to an inference of discrimination.

### a. *Temporary Reassignment to Breast Imaging*

The Court first considers Smith's temporary reassignment to breast imaging. In November 2016, Farquharson, Smith's supervisor, temporarily reassigned her to rotate through the breast imaging center a few days per week. JSF ¶ 29; Def. 56.1 ¶ 6. This reassignment is not an adverse action for several reasons.

First, as Smith agrees in the joint statement of undisputed facts, this reassignment was temporary.  JSF ¶ 29.  The temporary nature of the reassignment weighs against a finding that the reassignment was an adverse action, as "[c]ourts have held before that temporary transfers do not constitute adverse employment actions."  *Bonnano v. Verizon N.Y., Inc.*, No. 06 Civ. 6671 (DAB), 2011 WL 832855, at *9 (S.D.N.Y. Mar. 4, 2011); *see also Freeman v. Dep't of Envtl. Prot.*, No. 10 Civ. 1555 (NGG) (LB), 2013 WL 817221, at *5 (E.D.N.Y. Feb 5, 2013), *report and recommendation adopted*, 2013 WL 801684 (E.D.N.Y. Mar. 5, 2013) ("[C]ourts in this circuit have regularly held that *temporary* reassignments which do not impact an employee's salary or benefits do not constitute an adverse employment action." (emphasis in original) (collecting cases)).[16]  This is especially true given that Smith continued her normal responsibilities and was reassigned—a few days a week—to help address a staffing shortage, due to Urena's maternity leave.  JSF ¶ 30; *see Ping Chow Wei v. Antehm Inc.*, No. 16 Civ. 468 (SFJ) (AKT), 2018 WL 5622571, at *3, 11 (E.D.N.Y. Sept. 4, 2018) (no adverse action where plaintiff was temporarily reassigned to address staffing shortage and reassignment did not result in

---

[16] *See also, e.g.*, *Scott v. N. Manor Multicare Ctr., Inc.*, No. 15 Civ. 2495 (JCM), 2018 WL 1627270, at *14 (S.D.N.Y. Mar. 30, 2018) (temporary reassignment not adverse employment action); *Mayo-Coleman v. Am. Sugars Holding, Inc.*, No. 14 Civ. 79 (PAC) (KNF), 2017 WL 4157379, at *11 (S.D.N.Y. Sept. 18, 2017) (same for temporary two-week transfer); *Hardy v. Pepsi Bottling Co. of N.Y., Inc.*, No. 14 Civ. 4007 (VEC), 2016 WL 1301181, at *6 n.6 (S.D.N.Y. Mar. 31, 2016), *aff'd*, 690 F. App'x 60 (2d Cir. 2017) (same for temporary reassignment to lighter shift); *Dumay v. City of New York*, No. 09 Civ. 6866 (NRB), 2011 WL 4901311, at *6 (S.D.N.Y. Oct. 14, 2011) (same for temporary one-week reassignment); *Witkowich v. Holder*, No. 05 Civ. 7756 (GBD), 2010 WL 1328364, at *4 (S.D.N.Y. Mar. 31, 2010), *aff'd*, *Witkowich v. U.S. Marshals Serv.*, 424 F. App'x 20 (2d Cir. 2011) (same for temporary four- to six-week transfer); *Martinez v. N.Y.C. Dep't of Educ.*, No. 04 Civ. 2728 (LTS) (DFE), 2008 WL 2220638, at *10 n.11 (S.D.N.Y. May 27, 2008) (same for temporary summer transfer).

setback to her career or significant diminishment of her material responsibilities); *Leget v. Henderson*, No. 99 Civ. 3636 (DLC), 2001 WL 43615, at *1, 6 (S.D.N.Y. Jan. 18, 2001) (no adverse action where plaintiff reassigned to shift with shortage of workers and there was no change in salary, title, or benefits).

Even setting aside the temporary nature of Smith's reassignment, it cannot be considered an adverse employment action because it did not materially change the terms and conditions of her employment. *See Sanders*, 361 F.3d at 755; *see also Davies v. N.Y.C. Dep't of Educ.*, 563 F. App'x 818, 820 (2d Cir. 2014) (reassignment not adverse action in retaliation context); *Adeniji v. Admin. for Children Servs.*, 43 F. Supp. 2d 407, 426 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 430 (2d Cir. 1999) (table) ("Evidence of a transfer alone is insufficient to make out a case of discrimination."). Despite the reassignment, Smith did not receive "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss in benefits, [or] significantly diminished material responsibilities," *Sanders*, 631 F.3d at 755 (citation omitted)—she maintained her title, did not lose any of her duties as a lead ultrasound technologist, and received consistent pay, *see* JSF ¶¶ 7, 34; Def. 56.1 ¶ 11. In addition, far from constituting a change in the terms and conditions of her job, the conducting of breast ultrasounds fell squarely within Smith's job responsibilities. *See* JSF ¶ 8 (job responsibilities included "performing ultrasound scans of the breasts"); Def. 56.1 ¶ 5 (job description of lead technologist included performing "duties of Ultrasound Technologist as needed"); *see also Deitrich v. City of New York*, No. 18 Civ. 7544 (CM), 2019 WL 2236585, at *5 (S.D.N.Y. May 16, 2019) ("[A]ssignments that are part of an employee's normal responsibilities are not adverse actions where . . . the rate of

pay and benefits remain the same." (alteration in original) (citation omitted)).[17] Smith even

stated that she was "the best" at breast imaging. Def. 56.1 ¶ 8. Even if Smith found it more

difficult to fulfill her lead technologist duties because she was not on the main ultrasound floor

"at all hours," *see* Pl. 56.1 ¶ 63, that alone is insufficient to demonstrate an adverse employment

action, *Bowen-Hooks*, 13 F. Supp. 3d at 214.

Smith argues—disputed by defendants—that her reassignment to breast imaging was a

reassignment to "a less desirable and less prestigious position." Pl. 56.1 ¶ 61; *see also id.* ¶ 62.

Although a transfer from an "elite" department, "which provided prestige and opportunity for

advance," to "a less prestigious unit with little opportunity for professional growth" can

constitute an adverse action, *de la Cruz v. N.Y.C. Human Res. Admin Dep't of Soc. Servs.*,

82 F.3d 16, 21 (2d Cir. 1996), Smith has presented insufficient evidence of such here. Even

construing the facts in the light most favorable to Smith and accepting that breast imaging is less

desirable than the main ultrasound floor, Smith has not shown that she had any lessened

opportunity for advancement, given that she maintained her job as lead ultrasound technologist

and continued to carry on those duties as she rotated to breast imaging a few times per week. *See*

JSF ¶¶ 7, 34. And Smith's negative view of the reassignment is not enough to yield an adverse

action. *See, e.g.*, *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("[T]he

fact that the employee views the transfer either positively or negatively does not of itself render

the . . . receipt of the transfer an adverse employment action." (alteration and citation omitted));

*Garber v. N.Y.C. Police Dep't*, 159 F.3d 1346, at *3 (2d Cir. 1998) (table) ("[A] plaintiff's

---

[17] *See, e.g.*, *Mayo-Coleman*, 2017 WL 4157379, at *11 (finding that imposition of "routine task
required of all [defendants'] employees" was not "a materially adverse change" in plaintiff's
employment); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 214 (E.D.N.Y. 2014)
(finding that plaintiff's being asked to perform "subjectively undesirable" tasks that were not
"outside of her job description" did not constitute adverse action).

subjective perception that a demotion has occurred is not enough." (citation omitted)); *Pacheco v. N.Y. Presbyterian Hosp.*, 593 F. Supp. 2d 599, 618 (S.D.N.Y. 2009) ("The fact that Plaintiff may not have wanted to transfer does not alter the analysis."); *Cobian v. New York City*, No. 99 Civ. 10533 (KMW), 2000 WL 1782744, at *17 & n.38 (S.D.N.Y. Dec. 6, 2000), *aff'd*, 23 F. App'x 82 (2d Cir. 2001) (collecting cases). Smith's temporary rotation to breast imaging, located one floor below the main ultrasound floor, Def. 56.1 ¶ 6, was not an adverse action, but a "minor annoyance," *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), or "mere inconvenience," *Sanders*, 361 F.3d at 755.

Further, even if the reassignment were an adverse action, Smith has not shown that it occurred in circumstances giving rise to an inference of discrimination. Smith attempts to show that she was treated differently from similarly situated lead technologists, in that "no other lead technologist was assigned to any adjacent department, besides their own, no other lead technologist was assigned anywhere." Pl. 56.1 ¶ 55. However, Fabian Falcon, a white male lead CT technologist, rotated to the Emergency Department, in addition to working in the main CT department. Def. 56.1 ¶¶ 43–44. Although Smith conclusorily states that she believed the reassignment was part of "ongoing discrimination and harassment," Pl. 56.1 ¶ 60, she has not presented evidence that the transfer was based on her race, color, or sex. *See, e.g.*, *Krinsky v. Abrams*, No. 01 Civ. 5052 (SLT), 2007 WL 1541369, at *8 (E.D.N.Y. May 25, 2007), *aff'd*, 305 F. App'x 784 (2d Cir. 2009) (no inference of discrimination where plaintiff presented no evidence his temporary transfer was based on gender; court notes that its role "is not to evaluate the wisdom of personnel decisions, but merely to determine whether the decisions were rational and non-discriminatory" (citation omitted)).

b.     *Verbal Warning*

The second potential adverse action is the verbal warning that the Hospital gave Smith in May 2017 as a result of her March 23, 2017 inappropriate exchange with Carroll in front of a patient. *See* JSF ¶ 35; *see also* Cesaratto Decl., Exs. 31–32 (documentation of verbal warnings, given May 18, 2017). But "oral and written warnings do not amount to materially adverse conduct." *Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007); *see also Maragh v. Roosevelt Island Operating Corp.*, No. 16 Civ. 7530 (JMF), 2018 WL 6573452, at *3 (S.D.N.Y. Dec. 13, 2018) ("[A] written warning alone does not constitute an 'adverse employment action.'" (citation omitted)); *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 366 (S.D.N.Y. 2006), *aff'd*, 629 F.3d 276 (2d Cir. 2010) (formal verbal warning not adverse action). This is because "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).

Here, the Hospital's warning did not constitute an adverse employment action. It enforced its preexisting disciplinary policies by giving Smith—and Carroll, JSF ¶ 35—a warning after they violated its policies governing employee conduct. *See* Def. 56.1 ¶ 13. In addition, the warning was not accompanied by a materially adverse change in Smith's employment—it did not lead to, for example, further discipline, demotion, termination, or a reduction in her performance rating. *Id.* ¶ 16; *see Joseph*, 465 F.3d at 91 (application of employer's disciplinary policies "without more, does not constitute adverse employment action"); *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 306 (N.D.N.Y. 2013) ("Verbal and written warnings generally do not constitute adverse employment actions unless they lead to more substantial employment actions that are adverse." (citing *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 559–70 (2d Cir. 2011)); *see also Simon v. N.Y.C. Bd. of Educ.*, No. 01 Civ. 6024

(DGT), 2006 WL 1210959, at *8 (E.D.N.Y. May 2, 2006), *aff'd*, 240 F. App'x 887

(2d Cir. 2007) (warning letter constituted adverse action where it ultimately led to termination).

Even if the warning could be an adverse employment action, Smith has not presented

evidence that it was given in circumstances giving rise to an inference of discrimination.  She

and Carroll, also a black woman, both received the warning after violating the Hospital's

policies.  JSF ¶¶ 35, 37; Def. 56.1 ¶ 13.  Smith has not shown that the warning was in any way

tied to her race, color, or sex, nor has she presented any evidence that she was treated less

favorably than a similarly situated employee outside of her protected group.  Therefore, the

warning fails to satisfy both elements three and four of the *prima facie* case.

c.      *Carroll's Assignment to Draft Vascular Protocols*

The third potential adverse action was Carroll's assignment to draft vascular protocols.

*See* JSF ¶ 42.  In April 2017, Smith complained that Carroll was assigned to work on that

project.  *Id.*  Smith, again, has not presented evidence that Carroll's work on the vascular

protocols materially changed the terms and conditions of Smith's employment.  This includes a

lack of evidence that Carroll's assignment decreased Smith's responsibilities.  In addition, Smith

has failed to show that Carroll's assignment occurred in circumstances giving rise to an inference

of discrimination against Smith.  Smith has not alleged that Carroll, also a black woman, was

treated better than she because of her race, color, or sex.  *See* JSF ¶¶ 37, 48.  Further, Carroll had

a vascular certification, while Smith did not.  *Id.* ¶¶ 43, 46.  Smith agreed that Carroll's vascular

certification was a legitimate reason for her to draft the protocols, *id.* ¶ 45, and voiced her

support for Carroll, stating that "all technologists in the department of ultrasound are aware that

Ms. Carroll is developing the ultrasound vascular protocols, which we all support," *id.* ¶ 47.

Smith has thus failed to establish a *prima facie* case of discrimination with regard to Carroll's

assignment to draft vascular protocols.[18]

### d. Increased Scrutiny

Finally, Smith argues that she suffered an adverse employment action because she was

subjected to increased scrutiny. *See* Def. 56.1 ¶ 32; Pl. 56.1 ¶¶ 72, 92. She claims that, in this

vein, the Hospital allowed Sica to monitor her and placed her on a PIP. *See* Pl. 56.1 ¶ 98. Smith

has failed to present admissible evidence to support her assertions, and, even if she had, these do

not constitute adverse actions.

With regard to Smith's claims that Sica monitored her and that the Hospital placed her on

a PIP, Smith does not cite admissible evidence to support her claims. Instead, the sources that

she cites—the May 5, 2017 Transcript and emails from the same day, Pl. 56.1 ¶ 98; *see also*

O'Connell Decl., Exs. 30–31—do not, in fact, mention that prospect of Sica's monitoring Smith

or the Hospital's placing her on a PIP. *Cf. Ping Chow Wei*, 2018 WL 5622571, at *10 (no

adverse action based on alleged discriminatory comments where "[t]he record is devoid of any

evidence of [defendant] berating or belittling the Plaintiff"). In addition, defendants present

---

[18] Smith has not specifically pled or argued that defendants, by assigning Carroll to work on vascular protocols, failed to promote Smith to do the same. But even if she had pursued that claim, such an argument would not prevail. A failure by an employer to promote an employee can constitute an adverse employment action. *Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013). To establish a *prima facie* case for a failure to promote claim, a plaintiff must show that (1) she is a member of a protected class, (2) she applied for and was qualified for a job for which the employer was seeking applicants, (3) she was rejected for the position, and (4) the position remains open and the employer continues to seek applicants who have the plaintiff's qualifications. *Tanvir v. N.Y.C. Health & Hosps. Corp.*, 480 F. App'x 620, 621 (2d Cir. 2012). Smith has failed to meet these elements. She has not shown that she applied to, or showed interest in, a position drafting vascular protocols. *See Slaitane v. Sbarro, Inc.*, No. 03 Civ. 5503 (AJP), 2004 WL 1202315, at *18 n.29 (S.D.N.Y. June 2, 2004) (collecting cases). Nor has she shown that Carroll was less qualified than she to draft vascular protocols. *Gonzales v. City of New York*, 354 F. Supp. 2d 327, 334–35 (S.D.N.Y. 2005). In fact, she has presented evidence of the opposite—that Carroll was more qualified to draft vascular protocols than Smith because Carroll had a vascular certification, whereas Smith did not. JSF ¶¶ 43, 46.

affirmative admissible evidence, via the Negron Affidavit, that Smith was never placed on a PIP. *See* Def. 56.1 ¶ 17. Although Smith objects to use of this Affidavit because Negron was not deposed, *see, e.g.*, Pl. Reply 56.1 ¶ 17, the Court deems the fact admitted because Smith had the opportunity to depose Negron and chose not to do so, *see supra* n.5. As a result, Smith cannot rely on her conclusory assertions that Sica monitored her or that she was placed on a PIP to support her anti-discrimination claim.

However, even if Smith had presented admissible evidence and the facts were construed in her favor, these instances would not constitute adverse actions. In general, "excessive scrutiny without a tangible negative consequence to the employee does not rise to the level of an adverse employment action." *Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d 336, 350 (S.D.N.Y. 2010); *see also Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002) (collecting cases); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006) (same). And alleged close monitoring or observation by an employer is not an adverse action. *See Boyd v. Presbyterian Hosp. in the City of N.Y.*, 160 F. Supp. 2d 522, 536–37 (S.D.N.Y. 2001) ("hyperintensified observation" by hospital did not constitute adverse action where plaintiff failed to present specific instances of such observation); *Castro v. N.Y.C. Bd. of Educ. Pers.*, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("close monitoring" by employer not an adverse action). Nor is the issuance of a PIP. *See Brown v. Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) (affirming summary judgment, in context of Title VII retaliation claim, because PIP did not constitute adverse employment action); *see also Gormon v. Covidien, LLC*, 146 F. Supp. 3d 509, 525 (S.D.N.Y. 2015); *McGrath v. Thomson Reuters*, No. 10 Civ. 4944 (JSR) (JCF), 2012 WL 2119112, at *11 (S.D.N.Y. Apr. 30, 2012), *report and recommendation*

*adopted*, 2012 WL 2122325 (S.D.N.Y. June 12, 2012), *aff'd*, 537 F. App'x 1 (2d Cir. 2013) (collecting cases).

Smith, who is still employed by the Hospital as a lead ultrasound technologist, JSF ¶ 7, has not presented evidence of any negative consequences resulting from alleged increased scrutiny, and thus cannot rely on such scrutiny as an adverse action.

### 2.     Legitimate, Nondiscriminatory Reasons

Because Smith has failed to present a *prima facie* case of employment discrimination, summary judgment is properly granted for defendants. Even if Smith had met her burden of presenting such a case, defendants offer legitimate, nondiscriminatory reasons for each of the alleged adverse actions.

#### a.     *Temporary Reassignment to Breast Imaging*

Defendants offer two reasons for Smith's temporary reassignment to breast imaging. *See* Hosp. Mem. at 18–19; Doc. Mem. at 9–10. Each fulfills their burden of production at *McDonnell Douglas* step two.

First, defendants contend that Smith was reassigned to combat a staffing shortage that arose due to Urena's maternity leave. *See* Hosp. Mem. at 18; JSF ¶ 30. They selected Smith because breast imaging was part of her normal duties, *see id.* ¶ 8, and she was qualified to conduct breast scans, *id.* ¶ 31. Smith does not dispute her qualifications—in fact, she stated in her deposition that she is "the best" breast imager. Def. 56.1 ¶ 8. Addressing staffing shortages or other staffing needs is a legitimate, nondiscriminatory reason for an employment action. *See Doran v. N.Y. State Dep't of Health Office of Medicaid Inspector Gen.*, No. 15 Civ. 7217 (PKC), 2019 WL 4735484, at *10 (S.D.N.Y. Sept. 27, 2019) (combatting management shortage was legitimate, nondiscriminatory reason for defendants' promotion of candidate other than plaintiffs); *Ramsey v. N.Y.C. Health & Hosps. Corp.*, No. 98 Civ. 1594 (RPP), 2000 WL 713045,

at *9 (S.D.N.Y. June 2, 2000) ("reorganization of staffing needs" was legitimate, nondiscriminatory reason for defendant's transfer of plaintiff (citation omitted)); *Jones v. N.Y.C. Dep't of Hous. Pres. and Dev.*, No. 83 Civ. 1934 (PNL) (BN), 1985 WL 3399, at *5 (S.D.N.Y. Oct. 18, 1985) (need to fill vacant position until defendants could hire new employee was legitimate, nondiscriminatory reason for plaintiff's temporary transfer to that position, which consisted of largely the same duties and was located in same building as her current position).

Second, defendants state that Smith was reassigned to improve her working relationships with the technologists in breast imaging and to familiarize herself with the workflow there. Hosp. Mem. at 18–19; *see* JSF ¶¶ 32, 33. As early as December 2014, there was tension between Smith and the technologists in breast imaging, *see* Def. 56.1 ¶ 23, and Farquharson stated that "less than professional" actions on Smith's part prompted the reassignment, *id.* ¶ 6. Farquharson viewed this reassignment as an opportunity for Smith to "step up as a leader" and collaborate with the other technologists. JSF ¶ 33. This goal of defusing interpersonal conflict between Smith and other technologists—and giving Smith the opportunity to improve in her position as lead ultrasound technologist as a result—is a legitimate, nondiscriminatory reason for the reassignment. *Cf. Forte v. Liquidnet Holdings, Inc.*, No. 14 Civ. 2185 (AT), 2015 WL 5820976, at *10 (S.D.N.Y. Sept. 30, 2015), *aff'd*, 675 F. App'x 21 (2d Cir. 2017) ("interpersonal friction" with superior was legitimate, nondiscriminatory reason for defendant's termination of plaintiff); *Tanay v. St. Barnabas Hosp.*, No. 99 Civ. 9215 (JGK), 2001 WL 262695, at *7 (S.D.N.Y. Mar. 15, 2001) (conflict with co-worker was legitimate, nondiscriminatory reason for defendant's transfer of plaintiff).

### b. Verbal Warning

Defendants contend that the Hospital issued a verbal warning to Smith because of her unprofessional behavior in front of patients and colleagues. Hosp. Mem. at 17. Specifically, she

and Carroll had an inappropriate exchange in front of a patient, which violated the Hospital's policies governing conduct toward coworkers and patients. *See* JSF ¶ 35; Def. 56.1 ¶ 13. Violations of employer policy are legitimate, nondiscriminatory reasons for adverse actions. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir. 1997) (affirming grant of summary judgment where defendant terminated plaintiff for violation of policy, which was a legitimate, nondiscriminatory reason for termination); *see also Welland v. Citigroup, Inc.*, No. 00 Civ. 738 (NRB), 2003 WL 22973574, at *6 (S.D.N.Y. Dec. 17, 2003), *aff'd*, 116 F. App'x 321 (2d Cir. 2004). Similarly, an employer may act when an employee engages in disruptive behavior in the workplace. *See Hartley v. Rubio*, 785 F. Supp. 2d 165, 178–79 (S.D.N.Y. 2011) (collecting cases); *Portee v. Deutsche Bank*, No. 03 Civ. 9380 (PKC), 2006 WL 559448, at *9 (S.D.N.Y. Mar. 8, 2006) (plaintiff's comments to coworkers provided "a substantial basis for the employer to issue a warning to plaintiff against future conduct promoting interpersonal friction among co-workers"). The Hospital thus had legitimate, nondiscriminatory reasons to issue a warning in response to Smith's violation of workplace policies for her unprofessional conduct.

### c.     *Carroll's Assignment to Draft Vascular Protocols*

Defendants contend that Carroll was assigned to work on vascular protocols because she, unlike Smith, had a vascular certification and expressed a desire to do the work. *See* Hosp. Mem. at 19–20; Doc. Mem. at 10; *see also* JSF ¶¶ 42–43, 46. In fact, Carroll was the only technologist with such a certification. JSF ¶ 43. Smith admitted that this was a legitimate business reason for Carroll to do the work, *id.* ¶ 45, and later sent an email expressing the ultrasound department's support for Carroll's efforts, *id.* ¶ 47. Defendants clearly had a legitimate, nondiscriminatory reason for choosing Carroll to work on the protocols—she, given her certification, was better qualified than Smith, or any other technologist for that matter. *See*

34

*Ibrahim v. N.Y. State Dep't of Health, Office of Health Sys. Mgmt.*, 904 F.2d 161, 167 (2d Cir. 1990) (selecting employee with better qualifications is legitimate, nondiscriminatory reason for hiring decision); *Lloyd v. WABC-TV*, 879 F. Supp. 394, 402 (S.D.N.Y. 1995) (finding defendants' determination that another candidate possessed superior qualifications to plaintiff, although plaintiff also had experience, a legitimate, nondiscriminatory reason for not selecting plaintiff).

### d.        Increased Scrutiny

Defendants contest that Smith was subjected to any increased scrutiny, arguing that she has presented only conclusory allegations of such scrutiny. *See* Hosp. Reply at 2–3; Doc. Reply at 4. But, with regard to the allegation of increased scrutiny, defendants point out that they received frequent complaints from technologists and others about Smith. *See* Hosp. Reply at 3; Doc. Reply at 4–5; *see also, e.g.*, JSF ¶ 39; Def. 56.1 ¶ 24. These complaints would constitute a legitimate, nondiscriminatory reason for scrutiny and monitoring of Smith's work. *See Davies*, 563 F. App'x at 820 (complaints from students and teachers about plaintiff's poor performance provided legitimate, nondiscriminatory reason for employer subjecting plaintiff to increased scrutiny and evaluation).

### 3.        Pretext

To survive summary judgment, Smith must present "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant[s] were false, and that more likely than not discrimination was the real reason for the employment action." *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 25–26 (2d Cir. 2017) (brackets omitted) (quoting *Weinstock*, 224 F.3d at 42); *see also Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (admissible evidence must show defendants' decision "more likely than not based in whole or in part on discrimination" (citation omitted)).

Although Smith is not required to prove defendants' reasons were false, she has failed to rebut any of defendants' legitimate, nondiscriminatory reasons for the employment actions. *See Hirschberg v. Bank of Am., N.A.*, 754 F. Supp. 2d 500, 519 (E.D.N.Y. 2010) (finding no pretext where plaintiff failed to rebut defendants' legitimate, nondiscriminatory reasons for termination). Instead, in the face of these reasons, Smith points to several remarks that she contends evidence discrimination. *See* Smith Mem. at 9–11. These remarks consist of her testimony that: (1) Farquharson said, with regard to Smith's desire to file an EEOC complaint, that "they're just going to say, you know, Ms. Smith is playing the black card again," Pl. 56.1 ¶ 42; (2) Farquharson, after he left the Hospital, texted her regarding the new director of radiology: "HE DIDN'T FIRE ZAKEENAH? THAT WAS MY ONLY JOB . . . THEN HE SUCKS. ALL SHANKAR AND SICA WANTED WAS ZAKEENAH FIRED . . . NOTHING ELSE MATTERED," *id.* ¶¶ 107, 109; (3) Dr. Sophie Chang, an Asian American woman employed by Columbia, told Smith that the Doctors were "trying to get [her] fired," and that they "don't like women like us," *id.* ¶ 44; and (4) Sica attempted to get Urena to lie to the Hospital in order to get Smith in trouble, *id.* ¶ 47.

Defendants dispute each of these statements. But, on a motion for summary judgment, the Court must credit that these statements were made and must view the evidence in the light most favorable to Smith, the non-movant. The Court does so. Nevertheless, when viewing the admissible statements separately or in combination, such statements would not give a reasonable juror a basis to find that racial or gender discrimination was more likely than not a reason for the employment actions.

Statements, to be considered properly on a motion for summary judgment, must be admissible if testified to or otherwise introduced at trial. *See* Fed. R. Civ. P. 56; *see also Evans*

*v. Port Auth. of N.Y. and N.J.*, 192 F. Supp. 2d 247, 262 (S.D.N.Y. 2002), *clarified on reconsideration sub nom.*, No. 00 Civ. 5752 (LAK), 2002 WL 1941557 (S.D.N.Y. Aug. 22, 2002). They must be relevant, and their probative value cannot be substantially outweighed by any unfair prejudice they present. *Cf. Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (examining pre-trial motions and citing Fed. R. Evid. 402, 403). And, if offered for their truth, they may not be inadmissible hearsay. *See Barkley v. Penn Yan Cent. Sch. Dist.*, 442 F. App'x 581, 585 (2d Cir. 2011) (citing Fed. R. Civ. P. 56(c)(4)).

When evaluating the probative value of remarks in discrimination cases, courts evaluate the following factors:

> (1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process).

*Henry*, 616 F.3d at 149. The more removed remarks are from an employer's adverse action, the more likely that such remarks will be non-probative "stray remarks." *See id.*; *see also Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("[S]tray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination."); *Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.")).

Each remark cited by Smith is either inadmissible and/or a stray remark.

First, Smith contends that Farquharson told her that if she filed another EEOC complaint, "they" would say that she was "playing the black card again." Pl. 56.1 ¶ 42 (citing Smith Depo

Tr. at 220–21).[19]  Farquharson denies making such a statement, *see* Cesaratto Reply Decl.,

Ex. 39 ("Farquharson Depo Tr.") at 69–71, 95–96, but even assuming that he did, it is a stray

remark.  While Farquharson was Smith's supervisor, the timing and context of the statement

make it non-probative.  As to timing, Smith presents no admissible evidence as to when this

statement was made.  In her Complaint and brief, she states the remark was made in December

2015.  *See* Compl. ¶ 52; Smith Mem. at 10.  This would date the remark around one year before

any alleged adverse action—too temporally removed to be probative.  See *Yagudaev v. Credit*

*Agricole Am. Servs., Inc.*, No. 18 Civ. 513 (PAE), 2020 WL 583929, at *12–13

(S.D.N.Y. Feb. 5, 2020).  In her 56.1 counter-statement, she alleges that Farquharson made the

statement on December 8, 2016, Pl. 56.1 ¶ 42, but her underlying deposition attesting to the

statement does not attach any date to it, *see* Smith Depo Tr. at 220–21.  Even if Farquharson

made the comment then, it is of little probative value because it was made after the decision to

reassign Smith temporarily to breast imaging, *see Gonzalez v. Allied Barton Sec. Servs.*,

No. 08 Civ. 9291 (RJS) (RLE), 2010 WL 3766964, at *5 (S.D.N.Y. Sept. 7, 2010), *report and*

*recommendation adopted*, 2010 WL 3766954 (S.D.N.Y. Sept. 27, 2010) (remarks made after

adverse action less probative), and four months before her complaint about Carroll's work on the

vascular protocols and five months before the verbal warning, *see Yagudaev*, 2020 WL 583929,

at *13 (collecting cases for proposition that, without more, statements made "a few months"

before an adverse action are nonprobative).  As to context, Smith has not presented any evidence

that ties this statement to an employment decision or suggests that Farquharson was explaining

---

[19] In her unsworn memorandum, Smith states that Farquharson told her to "not play the black card again" and discouraged her from filing a second EEOC complaint.  Smith Mem. at 10. Such a contention is unsupported by her cited 56.1 counter-statement and her underlying deposition.

his motivations for any such decision. *See Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 484–85 (S.D.N.Y. 2013). In fact, he was not even employed by the Hospital, and therefore no longer a decisionmaker in Smith's case, after January 2017. *See* Farquharson Depo Tr. at 15. Farquharson's statement is thus a "stray remark" of little probative value.

Second, Smith states that after Farquharson left his employment with the Hospital, he texted her that both Sica and Shankar wanted Smith to be fired. *See* Smith Mem. at 10–11; Pl. 56.1 ¶¶ 107, 109 ("ALL SHANKAR AND SICA WANTED WAS ZAKEENAH FIRED . . . NOTHING ELSE MATTERED."). Reliance on these texts is problematic, however, for two reasons. First, Smith's 56.1 counter-statement cites to Exhibit 19 of the O'Connell Declaration as the source of the texts. *See* Pl. 56.1 ¶¶ 106–09. Exhibit 19 does not contain such texts,[20] nor are the texts anywhere else in the record. *See Weinstock*, 224 F.3d at 44 (no pretext where plaintiff did not present admissible evidence—only hearsay—that allegedly discriminatory statements were made). Second, the texts are inadmissible hearsay. Although the underlying statements of Sica and Shankar would be admissible if sourced directly to them, *see* Fed. R. Evid. 801(d)(2)(A), the texts themselves are out-of-court statements made by Farquharson, who is not a defendant and, at the time of the alleged texts, no longer worked for the Hospital. As a

---

[20] Instead, Exhibit 19 contains texts from December 6, 2016—before Farquharson left the Hospital in January 2017, *see* Farquharson Depo. Tr. at 15—in which Farquharson asked Smith, "Is there a reason why you are not scanning breast patients?" O'Connell Decl., Ex. 19 at 3. After Smith replied, "I don't understand the question. As per our last conversation and my directive I am doing exactly what I was told to do," Farquharson texted, "This is becoming pointless Zakeenah. Your time in breast imaging is familiarize [sic] yourself with the work flow including scanning." *Id.*

result, his statements cannot be imputed to the Hospital under Federal Rule of Evidence 801(d)(2)(D).

Third, Smith states that Dr. Sophie Chang told her that Sica and Shankar were "trying to get [Smith] fired" and "don't like women like us," *i.e.*, women of color who held supervisor roles at the Hospital. *See* Smith Mem. at 10; Pl. 56.1 ¶ 44.[21]  This statement is a blend of inadmissible hearsay and opinion testimony lacking a proper foundation.  Chang is employed by Columbia, who is not a defendant here; thus, her out-of-court statements cannot be imputed to the Hospital under Rule 801(d)(2)(D).  Even if Chang were employed by the Hospital, her statements are that of a co-worker, who is not Smith's supervisor and has no significant role in the employment decisions at issue.  As a result, Chang's statements concern a matter outside the scope of her employment and cannot be imputed to the Hospital.  *See Evans*, 192 F. Supp. 2d at 262–64 (co-worker's statement could not be imputed to employer, and thus was inadmissible, where there was no evidence that co-worker was plaintiff's supervisor, that he played a role in any relevant employment decision, or that the statement related to his duties); *see also Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 202–03 (S.D.N.Y. 2009) (co-worker's statement could not be imputed to employer where there was no evidence she "had anything to do with" the employment decision affecting plaintiff).

Fourth, Smith states that Sica asked Urena to lie to the Hospital to get Smith in trouble "and possibly lead to her termination."  Smith Mem. at 10; *see* Pl. 56.1 ¶ 47.  Again, this

---

[21] This statement suffers from a similar temporal uncertainty as that of Farquharson's alleged "black card" statement.  In her Complaint and brief, Smith states that Chang made statements to her in December 2015.  *See* Compl. ¶ 45; Smith Mem. at 10.  However, in her 56.1 counterstatement, Smith alleges that Chang spoke with her in "early December 2016," Pl. 56.1 ¶ 44, with Smith testifying in her deposition that the conversation "might have been in 2016 or '17," Smith Depo Tr. at 253.

statement is inadmissible hearsay. Urena is Smith's co-worker, and her statement cannot be imputed to the Hospital—she is not Smith's supervisor, and there is no evidence that she had anything to do with the employment decisions at issue here. *See Di Giovanna*, 651 F. Supp. 2d at 202–03; *Evans*, 192 F. Supp. 2d at 262–64.

In the end, Smith is left only with her conclusory allegations that she was treated differently than other lead technologists because of her race, color, and sex. *See* Smith Mem. at 10; *see also* Pl. 56.1 ¶¶ 45–46. She agrees that none of her supervisors made disparaging comments based on her race, color, or sex, nor did she ever hear the Doctors make such comments. JSF ¶¶ 49, 51. And she never complained to the Hospital about any comments that anyone made based on her race, color, or sex. *Id.* ¶ 50. Smith's conclusory allegations of discrimination are insufficient to demonstrate pretext and survive summary judgment. *See Barkley*, 442 F. App'x at 585; *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996). The Court therefore grants summary judgment for defendants on Smith's discrimination claim, both because Smith has failed to show that she was subjected to an adverse action and because she has presented insufficient evidence of pretext.

**B.      Retaliation Under Title VII and the NYSHRL**

Title VII forbids an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The NYSHRL similarly makes it unlawful for an employer to retaliate or discriminate against an employee because she "has opposed any practices forbidden under this article or because . . . she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

Like discrimination claims, retaliation claims under either law are analyzed using the

*McDonnell Douglas* burden-shifting framework.  *See Zann Kwan v. Andalex Grp. LLC*,

737 F.3d 834, 843 (2d Cir. 2013).  As in the context of Smith's discrimination claim, she must

first make out a *prima facie* case.  To establish a *prima facie* case of retaliation, a plaintiff must

establish: "(1) that she participated in an activity protected by Title VII, (2) that her participation

was known to her employer, (3) that her employer thereafter subjected her to a materially

adverse employment action, and (4) that there was a causal connection between the protected

activity and the adverse employment action."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552

(2d Cir. 2010).  The burden of proof at the *prima facie* stage has been characterized as "*de*

*minimis*."  *Hicks*, 593 F.3d at 166.  If the initial burden is met, "a 'presumption of retaliation'"

arises, which the employer "may rebut by 'articulating a legitimate, non-retaliatory reason for the

adverse employment action.'"  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70

(2d Cir. 2015) (brackets omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173

(2d Cir. 2005)).

If the employer provides such a reason, "the presumption of retaliation dissipates," and

the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of

the challenged employment action."  *Id.* (citations omitted).  Although "but-for" causation does

not require a showing that retaliation was an employer's sole motive, showing that retaliation

was "simply a 'substantial' or 'motivating' factor in the employer's decision" is insufficient to

prove a retaliation claim.[22]  *Zann Kwan*, 737 F.3d at 845 (citing *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)).

### 1. *Prima Facie* Case

Defendants do not contest that Smith has satisfied the first two elements of her *prima facie* case.  *See* Hosp. Mem. at 22; Doc. Mem. at 10.  Instead, they argue that she has failed to demonstrate that she was subjected to an adverse employment action, or that there was a causal connection between her protected activity and that action.  *See* Hosp. Mem. at 22–23; Doc. Mem. at 11–12.  The Court agrees as to the latter element.

### a. *Adverse Action*

Although defendants make substantial arguments as to why Smith has failed to demonstrate an adverse action, the standard for an adverse action in the retaliation context, unlike the discrimination context, "is not limited to discriminatory actions that affect the terms

---

[22] The Second Circuit has yet to decide explicitly whether the but-for causation standard applies to claims under the NYSHRL, as it does under Title VII.  *See Holcomb v. State Univ. of N.Y. at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017); *Kleehammer v. Monroe County*, 583 F. App'x 18, 21 (2d Cir. 2014); *Zann Kwan*, 737 F.3d at 847 n.7.  The Circuit, however, has implicitly applied the but-for standard to NYSHRL claims on several occasions.  *See Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14–16 (2d Cir. 2018) (affirming grant of summary judgment for defendant on Title VII and NYSHRL retaliation claims where plaintiff failed to raise genuine issue of material fact as to but-for causation); *Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 14–15 (2d Cir. 2018) (explaining but-for causation where retaliation claim brought only under NYSHRL); *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 7 (2d Cir. 2017) (finding that "the record lack[ed] sufficient support for [plaintiff's] argument under the but-for causation standard of . . . NYSHRL").  District courts within this Circuit—including this Court— have also applied the but-for standard to NYSHRL claims.  *See, e.g.*, *Figueroa v. KK Sub II, LLC*, 289 F. Supp. 3d 426, 441 n.10 (W.D.N.Y. 2018) (collecting cases); *Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 539 (S.D.N.Y. 2017); *Misas v. N. Shore-Long Island Jewish Health Sys.*, No. 14 Civ. 8787 (ALC), 2017 WL 1535112, at *9 n.8 (S.D.N.Y. Apr. 27, 2017); *Richardson v. Bronx Lebanon Hosp.*, No. 11 Civ. 9095 (KPF), 2014 WL 4386731, at *16 n.16 (S.D.N.Y. Sept. 5, 2014); *Bowen-Hooks*, 13 F. Supp. 3d at 220 n.25 (collecting cases); *Taylor v. Seamen's Soc'y for Children*, No. 12 Civ. 3713 (PAE), 2013 WL 6633166, at *23 (S.D.N.Y. Dec. 17, 2013).  The Court applies such standard to the NYSHRL claim here too, but, for the reasons discussed below, Smith could not satisfy the lesser "substantial" or "motivating" factor standard, either.

and conditions of employment." *Vega*, 801 F.3d at 90 (quoting *White*, 548 U.S. at 64); *see also*

*Hicks*, 593 F.3d at 165 (describing anti-retaliation protection as "broader"). Instead, an adverse

employment action for retaliation is "any action that 'could well dissuade a reasonable worker

from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *White*,

548 U.S. at 57). Although "petty slights or minor annoyances" are not actionable, the Supreme

Court has emphasized that "[c]ontext matters." *Hicks*, 593 F.3d at 165 (brackets omitted)

(quoting *White*, 548 U.S. at 68–69). "[S]omething might be a 'petty slight' to one person but

'matter enormously' to another, such that it could 'deter a reasonable employee from

complaining about discrimination.'" *Massaro v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,

774 F. App'x 18, 22 (2d Cir. 2019) (quoting *Vega*, 801 F.3d at 90). Given that broader standard,

the Court will assume *arguendo* that Smith has shown sufficient evidence of an adverse action to

satisfy the third element of her *prima facie* case. *See Hill*, 467 F. Supp. 2d at 363–64 (finding

reassignment without change in job title and subjection to excessive scrutiny to constitute

adverse actions for retaliation, but not discrimination, claims).

b.      *Causal Connection*

The final element of causation may be proved either "directly, through evidence of

retaliatory animus directed against the plaintiff by the defendant," or "indirectly, by showing that

the protected activity was followed closely by the discriminatory treatment." *Hicks*, 593 F.3d

at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). Smith has

failed to adduce evidence of either.

Direct evidence is "evidence tending to show, without resort to inference, the existence of

a fact in question." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992); *see also*

*Redd v. N.Y. State Div. of Parole*, 923 F. Supp. 2d 371, 385–87 (E.D.N.Y. 2012) (analyzing

direct evidence in context of retaliation claim). The Second Circuit has explained that such

evidence "would be an admission by the decisionmaker" that he or she made a decision by relying on an improper consideration, *e.g.*, "I fired him because he was too old." *Tyler*, 958 F.2d at 1185. Although Smith does not present any evidence as explicitly constituting direct evidence, three statements that she cites could potentially fall into this category.[23]

First, she relies on Farquharson's statement that if she filed an EEOC complaint, "they're just going to say . . . Ms. Smith is playing the black card again." *See* Pl. 56.1 ¶ 42; Smith Mem. at 14. However, several inferences are required to conclude that this was an admission of retaliation. Most important, it is unclear who "they" refers to, and Farquharson does not state that "they" did anything because Smith filed a complaint. In other words, the statement is unconnected to any adverse action.

Second, Smith cites an email from Sica, in which he says that it is "obvious to all that the current structure and supervision of the ultrasound section is not working. I am asking that the administration intervene so we can move forward . . ." *See* Pl. 56.1 ¶ 87; Apr. 2017 Emails at 3; Smith Mem. at 15. Although not noted by Smith, Sica continues his sentence, ". . . with creating a more unified and professional department and focus our time and energy on providing the best patient care possible." Apr. 2017 Emails at 3. Smith contends that Sica is asking to have her replaced because of her protected activity, *see* Smith Mem. at 15, but several large inferential leaps are required to reach that conclusion. It is not clear from Sica's email that his idea of "mov[ing] forward" was replacing Smith, nor is it clear that if that were the case, his motivation was Smith's filing of the EEOC complaint. Neither statement comes close to a direct admission by a decisionmaker that he or she took an action based on a retaliatory motive. *Cf. Hicks*,

---

[23] Other statements that Smith relies on, including the texts from Farquharson, the claim that Sica attempted to get Urena to lie about Smith, and the statements from Chang, are inadmissible and thus not discussed here. *See supra* pp. 39–41.

593 F.3d at 170 (causation satisfied where plaintiffs' affidavit attested that defendant told them he "knew who cooperated in the investigation against him and that he would retaliate against them for their cooperation").

Third, Smith cites a statement from Sica, made in the May 7, 2017 meeting, that he wanted the radiologists to be protected. *See* Def. Reply ¶ 97; May 7, 2017 Tr. at 15; Smith Mem. at 15. In this meeting, Sica stated that "when an inappropriate or a complaint email gets sent out, we need to address it, and there needs to be a write-up about it." May 7, 2017 Tr. at 15. He further stated, "I don't want to ever hear again that, well, there's no documentation or thing aren't being investigated." *Id.* And, last, he said that "Columbia Radiology insists that we're— that the radiologists are protected from this." *Id.* Smith frames these statements as Sica's "mak[ing] it clear that he wanted to protect himself and doctors from employees who engaged in protected activity." Smith Mem. at 15. These statements, however, demonstrate that Sica asked for complaints to be investigated and documented. They do not express an intent to retaliate based on such investigations or reflect a direct admission of retaliation—such a conclusion would require an inferential step.

A causal connection can also be proved indirectly by demonstrating temporal proximity between the protected activity and an adverse action. *See Zann Kwan*, 737 F.3d at 845. Although the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001), the Supreme Court has suggested that the temporal proximity "must be very close," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (internal quotation marks and citation omitted). Smith has presented two instances of protected activity: her 2014 EEOC complaint, filed on June

12, 2014, Def. 56.1 ¶ 3; and her 2017 EEOC complaint, which defendants were aware of by January 11, 2017, *id.* ¶ 60.[24]

Smith cannot demonstrate a causal connection between the 2014 EEOC complaint and any of the alleged adverse actions, the earliest of which occurred in November 2016 (the breast imaging reassignment). This period of more than two years suggests "no causality at all." *Clark Cty. Sch. Dist.*, 532 U.S. at 274 (no causality for adverse action 20 months after protected activity); *see also Altieri v. Albany Pub. Library*, 172 F. App'x 331, 333 (2d Cir. 2006) (same for 21 months).

The 2017 EEOC complaint has more potential. Defendants were aware of this complaint on January 11, 2017, before Carroll's assignment to draft vascular protocols in April 2017, *see* JSF ¶ 42,[25] and before Smith received a verbal warning on May 18, 2017, *see* Cesaratto Decl., Exs. 31, 32. However, the three-month gap until Carroll's assignment and the four-month gap until the verbal warning are insufficient to yield an inference of causal connection. *See Caddick v. Pers. Co. I LLC*, No. 16 Civ. 7326 (ALC), 2018 WL 3222520, at *9 (S.D.N.Y. June 29, 2018) ("Nine or ten weeks is at the outer bounds of what is acceptable where, as here, a plaintiff relies solely on temporal proximity to demonstrate causation."); *Flood v. UBS Asset Mgmt., Inc.*, No. 10 Civ. 374 (RJH), 2012 WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012) ("[C]ourts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation."

---

[24] At some point, Carroll showed Sica a photograph of Smith's EEOC documents. Pl. 56.1 ¶ 41. It is not clear from the record when that occurred.

[25] The record demonstrates that Smith complained of Carroll's assignment in April 2017. *See, e.g.*, JSF ¶ 42. It does not show, however, exactly when Carroll was first assigned.

(citation omitted)); *see also, e.g.*, *Clark Cty. Sch. Dist.*, 532 U.S. at 273–74 (citing cases where

three to four months deemed insufficient); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85–86

(2d Cir. 1990) (finding three and a half months insufficient); *Feliciano v. City of New York*,

No. 14 Civ. 6751 (PAE), 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) (collecting cases

requiring, for a retaliatory inference to arise, adverse activity to occur within approximately two

months of plaintiff's protected activity); *McManamon v. Shinseki*, No. 11 Civ. 7610 (PAE),

2013 WL 3466863, at *12–13 (S.D.N.Y. July 10, 2013) (collecting cases where two to three

months deemed insufficient and holding three-month gap insufficient); *Frisenda v. Inc. Vill. of

Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011) (collecting cases where two to three

months deemed insufficient); *Garrett v. Garden City Hotel, Inc.*, No. 05 Civ. 0962 (JFB), 2007

WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (same).[26]

Smith also cannot demonstrate any connection between the 2017 complaint and her

reassignment to breast imaging, which occurred in November 2016, Def. 56.1 ¶ 6, or defendants'

alleged increased scrutiny of her, which the record reflects that she first alleged on December 27,

2016, Pl. 56.1 ¶ 72. That is because both actions occurred *before* defendants were aware of the

drafted EEOC charge. *See Marshall v. N.Y.C. Bd. of Elections*, 322 F. App'x 17, 19–20

(2d Cir. 2009) (affirming summary judgment where transfer occurred one month before plaintiff

filed charge); *Holmes v. Astor Servs. for Children and Families*, No. 16 Civ. 2260 (CS),

2017 WL 3535296, at *7 (S.D.N.Y. Aug. 16, 2017) (no causal connection where allegedly

---

[26] The Second Circuit has found, in some cases, that longer time periods can support an inference of causation. In those cases, the plaintiff has often presented additional evidence supporting the causal relationship. *See, e.g.*, *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (finding four months to support causation where adverse action "occurred at the first actual opportunity to retaliate," and seven months "not prohibitively remote" where decisionmaker had personal knowledge of protected activity when she terminated plaintiff's employment and had made a comment suggesting a retaliatory motive).

retaliatory actions occurred before protected activity); *see also Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 582 (W.D.N.Y. 2011) ("The crux of any retaliation claim is a cause-and-effect relationship whereby protected activity precedes, and gives rise to, an adverse employment action. It is axiomatic that no such relationship can be found to exist where the alleged adverse employment action began and ended *prior* to the commencement of any protected activity." (emphasis in original)). Although Smith again complains of increased scrutiny in April 2017, Pl. 56.1 ¶ 92; Def. 56.1 ¶ 32, causation is defeated because the scrutiny is a "gradual adverse job action[]" beginning before defendants were aware of the protected activity, *see Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 657–58 (2d Cir. 2009) (quoting *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

### 2.    But-for Causation

The legitimate, nondiscriminatory reasons offered by defendants for the adverse actions in the discrimination context apply to the retaliation claim, too. *See supra* pp. 32–35. Even assuming *arguendo* that Smith met her burden of presenting a *prima facie* case, she has failed to show that defendants' reasons were pretextual. While temporal proximity can support a causal connection at the *prima facie* stage, it is "insufficient to defeat summary judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847. Instead, Smith must present some evidence that retaliation was the but-for cause of each adverse action. *See Montanez v. McDean LLC*, 770 F. App'x 592, 595 (2d Cir. 2019).

In short, defendants have marshalled substantial evidence of their nondiscriminatory reasons for each of the alleged adverse employment actions: They reassigned Smith to breast imaging temporarily because Smith was qualified to perform breast imaging, and they needed to fill a staffing shortage created by Urena's maternity leave and hoped to reduce tensions between Smith and the other technologists, *see* JSF ¶¶ 30–33; they issued a verbal warning to Smith

because she had a confrontation with a coworker in front of a patient, in contravention of Hospital policy, *see id.* ¶ 35; Def. 56.1 ¶ 13; they assigned Carroll to draft vascular protocols because Carroll was the only technologist with a vascular certification, *see* JSF ¶¶ 43–46; and any additional scrutiny they placed on Smith was justified due to the complaints they had received from other technologists and Hospital employees, *see, e.g.*, *id.* ¶¶ 25, 32, 39; Def. 56.1 ¶¶ 22, 25–26, 29–30, 34, 35, 37. Smith has not offered a single argument in response to these reasons. *See Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 276–77 (S.D.N.Y. 2007) (finding no pretext where plaintiff "failed to argue or to offer any evidence contrary to defendants'" reasons).

Smith has only offered a few statements to show ostensible pretext. These include the text messages from Farquharson, the conversation with Chang, and the allegation that Sica attempted to get Urena to lie to the Hospital about Smith. Each of these is inadmissible and thus does not create a genuine issue of material fact as to pretext. *See supra* pp. 39–41. Smith has also offered the statement from Farquharson that, if she filed an EEOC complaint, she would be considered to be "playing the black card again." As discussed earlier, this is a nonprobative stray remark. *See supra* pp. 37–39. Smith has also cited the email from Sica asking, in April 2017, for Hospital intervention to help the radiology department "move forward." Apr. 2017 Emails at 3. The email is not connected to any particular employment decision, and the content of this comment does not appear to evince a retaliatory motive. Lastly, Smith cites Sica's statements asking for the Hospital to investigate complaints and stating that Columbia wanted the radiologists to be "protected from this." May 7, 2017 Tr. at 15. Again, these statements are not connected to an employment decision, and their content expresses a desire to have investigations of complaints—not a desire to retaliate based on those investigations. Even if these three

statements were probative, they are insufficient for Smith to carry her burden of showing that a retaliatory motive was the but-for cause of the alleged adverse actions. *See Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 24 (2d Cir. 2011) (finding stray remark, even if treated as probative, insufficient to support but-for causation); *Yagudaev*, 2020 WL 583929, at *13 (same for several statements).

In the end, Smith is left to combat defendants' legitimate, nondiscriminatory reasons for the adverse actions with her conclusory claim that defendants retaliated against her. *See Hill*, 467 F. Supp. 2d at 365 (holding that plaintiff's conclusory allegation of excessive scrutiny, even when such scrutiny occurred close in time to protected activity, failed to demonstrate pretext). Such threadbare allegations cannot carry the day. No reasonable juror could find, based on this record, that retaliation was the but-for cause of defendants' adverse actions. The Court therefore grants summary judgment for defendants on Smith's retaliation claims.

C.    **Hostile Work Environment Under Title VII and the NYSHRL**

Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard. *Summa*, 708 F.3d at 123–24. To prevail on a hostile work environment claim under either statute, a plaintiff must show: "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks and citations omitted). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* Unlike pervasive harassment, "[i]solated, minor acts or occasional episodes do not warrant relief." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999). This test has both objective and subjective elements. "Conduct that is not severe

or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21–22.

Courts evaluate whether an environment is "hostile" or "abusive" by examining the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. To prevail, a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (citation omitted). Finally, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan*, 192 F.3d at 318.

Smith's evidence to support her hostile work environment claim is quite thin. She argues, conclusorily, that she was discriminated against because she was a woman of color in a lead technologist role, she made complaints of such discrimination, and defendants subjected her to continuous adverse actions that affected her work performance. *See* Smith Mem. at 19. Although Smith does not discuss the statements she relied on for her discrimination and retaliation claims, the Court considers those here, too. These instances fall far short of the severe or pervasive conduct needed to support a hostile work environment claim.

First, Smith's general allegations that defendants took adverse actions against her are insufficient to support a hostile work environment claim. While defendants' alleged adverse acts

are relevant to her discrimination and retaliation claims, she "cannot piggyback [such] discrete adverse acts about which [s]he complains onto hostile work environment claims in order to make them actionable." *Magadia v. Napolitano*, No. 06 Civ. 14386 (CM), 2009 WL 510739, at \*17 (S.D.N.Y. Feb. 26, 2009). Without showing a connection between these adverse actions and an ongoing practice of harassment, the adverse actions are simply irrelevant to her hostile work environment claim. *See Lioi v. N.Y.C. Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 591 (S.D.N.Y. 2012).

Second, even if the adverse actions were considered, Smith has presented almost no evidence—aside from her general allegation that she was subjected to discrimination as a woman of color—linking the alleged harassment to her race, color, or sex. *See Alfano*, 294 F.3d at 377 (excluding from consideration decisions lacking link to protected characteristic). Although actions that are neutral on their face can at times be considered in assessing the totality of the circumstances, that is only true where there is "some circumstantial or other basis for inferring that [such] incidents . . . were in fact discriminatory." *Id.* at 378. The only evidence Smith offers that relates to these protected characteristics are Farquharson's "black card" comment and Chang's comment that the Doctors "don't like women like us." *See* JSF ¶¶ 49, 51 (none of Smith's supervisors made disparaging comments based on her race, color, or sex, nor did she hear the Doctors make such comments). And of these two comments, only Farquharson's is admissible. *See supra* pp. 38–40. But even considering both comments, along with the other evidence in the record, there is not sufficient circumstantial evidence that the other acts Smith alludes to—*i.e.*, alleged adverse actions such as her reassignment to breast imaging, Carroll's assignment to work on vascular protocols, Smith's verbal warning, or the increased scrutiny placed on Smith—or the other statements she cites are, in fact, connected to race or gender.

Therefore, other acts or statements cannot be considered in relation to her hostile work environment claim.

Third, Farquharson and Chang's comments fall far short of the severity or frequency required for a successful hostile work environment claim. As to severity, courts in this Circuit have granted summary judgment to employers despite conduct far more severe than that alleged here. *See, e.g.*, *Marshall*, 322 F. App'x at 18–19 (finding no hostile work environment where homosexual supervisor showed plaintiff a "sexual device he had purchased for his partner," even though plaintiff "may have been legitimately offended" by such talk; had a violent temper; "stood over her with clenched fists on several occasions"; disparaged her education; and engaged in "crass behavior"); *Murray*, 528 F. Supp. 2d at 278–79 (S.D.N.Y. 2007) (finding male-to-male statements in the workplace such as "you're such a bitch," "good morning ladies," "when are you going to come out of the closet," and "are you ladies going to the parade?" insufficient to defeat summary judgment on hostile work environment claim); *Mack v. Port Auth. of N.Y. & N.J.*, 225 F. Supp. 2d 376, 388–89 (S.D.N.Y. 2002) (finding allegations that supervisor called plaintiff a "boy," made petty criticisms of nonwhite workers, gave disparate work assignments, and engaged in disparate enforcement of lunch and break limitations inadequate for race-based hostile work environment claim); *Dayes v. Pace Univ.*, No. 98 Civ. 3675 (WHP), 2000 WL 307382, at *1, 4–5 (S.D.N.Y. Mar. 24, 2000), *aff'd*, 2 F. App'x 204 (2d Cir. 2001) (granting summary judgment to defendant where plaintiff was subjected to six sexual comments and multiple requests for dates, was screamed at by a supervisor, and was touched on the back); *Lucas v. S. Nassau Cmtys. Hosp.*, 54 F. Supp. 2d 141, 147–49 (E.D.N.Y. 1998) (denying NYSHRL hostile work environment claim where supervisor brushed against plaintiff three times, touched plaintiff three times, briefly touched plaintiff's back or shoulders five to seven other

times, asked about the color of plaintiff's underwear, said plaintiff wanted to "go to bed" with her, and said "fuck you" to plaintiff on two occasions); *Ricard v. Kraft Gen. Foods, Inc.*, No. 92 Civ. 2256 (GLG), 1993 WL 385129, at *3 (S.D.N.Y. Mar. 16, 1993), *aff'd*, 17 F.3d 1426 (2d Cir. 1994) (finding four sexually-oriented incidents insufficient to withstand summary judgment). And as to frequency, these two statements are isolated and "episodic," far from "sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374 (quoting *Perry*, 115 F.3d at 149). They do not come close to creating an environment "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* at 373.

The Court therefore holds that no reasonable juror could find that a hostile work environment existed as to Smith, and grants defendants summary judgment on Smith's hostile work environment claims.

### D.     Remaining Claims

Because the Court has found that there is no underlying violation of the NYSHRL, it also grants summary judgment for defendants on the claims of aiding and abetting discrimination, retaliation, and unlawful conduct under the NYSHRL. *See Falchenberg v. N.Y. State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009) (explaining that "aiding and abetting is only a viable theory where an underlying violation has taken place" and dismissing claims under NYSHRL and other statutes when there was no underlying violation of such statutes).

This leaves Smith's final claim—breach of contract under state law. *See* Compl. ¶¶ 164–70. Because the Court has disposed of Smith's federal Title VII claims, it must decide whether to retain jurisdiction over this remaining claim. "[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all

federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks and citations omitted); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *see also One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims . . . ."); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

Judicial economy and convenience favored resolution of Smith's NYSHRL claims because "the substantive standard for liability under the [two] statutory schemes are coextensive." *Downey v. Adloox Inc.*, No. 16 Civ. 1689 (JMF), 2018 WL 5266875, at *9 (S.D.N.Y. Oct. 23, 2018) (alterations in original) (citation omitted); *see also Yagudaev*, 2020 WL 583929, at *16. However, these same factors point the Court toward declining jurisdiction over Smith's breach of contract claim. This state common law claim is distinct from the federal law claims that have already been adjudicated, and the parties have neglected completely to brief the issue. The Court accordingly declines to exercise supplemental jurisdiction over this claim. The breach of contract claim is dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motions for summary judgment as to Smith's Title VII and NYSHRL discrimination, retaliation, and hostile work environment claims, in addition to her NYSHRL aiding and abetting claim. The Court dismisses, without prejudice, Smith's breach of contract claim. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 67 and 69 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 18, 2020
      New York, New York